This court now resumes its session. Please be seated. Holder. Oh, there you are. Okay. Good morning. Good morning. May it please the Court, my name is Jeff Renzi. I'm here on behalf of Petitioner Gregory Aguilar. As a preliminary matter, I'd like to reserve two minutes of my time for rebuttal. Okay. You know, everybody does that, but it's really not necessary. But it's sort of a calming statement, you know. Well, I got that out without much error. That's right. You're ahead of the game. There we go. And I'm actually standing here today with some trepidation about going through the current statutory structure of immigration law, which Chief Judge Kaczynski actually referred to earlier this year as a Byzantine structure. And I do so, of course, because, you know, it is our belief that the immigration judge in this case made several erroneous rulings, and those rulings were ultimately upheld by the Board of Immigration Appeals. Yeah, well, the immigration laws are next in complexity to the Internal Revenue Code. And how about sentencing guidelines, too? Sentencing guidelines, too, yeah. Yeah, all the good things. With all due respect, Your Honor, I actually find the IRS regulations a little bit more explicit than the immigration structure. But that being said. Well, you were probably an IRS agent along the line. Far from it, Your Honor. But two of the areas I'd like to discuss are the denial of Section 212C relief for Mr. Aguilar and the finding by the immigration judge and ultimately the Board of Immigration Appeals that Mr. Aguilar is barred from seeking asylum. And this is, of course, due to the impermissible retroactive application of a Department of Homeland Security statute regulation. Starting first off, in this case, Mr. Aguilar was deemed removable for his guilty pleas for a 1990 robbery conviction and a 2003 petty theft. The immigration judge found that the robbery and theft convictions each constituted a crime of moral turpitude, meaning there were two crimes of moral turpitude, and Mr. Aguilar was removable on that ground. And then, in addition, the robbery also constituted an aggregated felony, which provided an independent ground for removal. Well, the only chance he's got is on his cat claim.  I'm not going to go into that, Your Honor, because I believe the 212C relief is available to Mr. Aguilar. All right. Okay. And, of course, that, again, we're going into this complex statutory scheme because 212C, of course, was repealed in 1997. But we have the Supreme Court case of St. Cyr and the CFR Section 12, 12.3 allowance of 212C relief for Mr. Aguilar because he was convicted of this robbery conviction. The robbery conviction occurred in 1990, which was prior to the repeal. And then to be eligible for 212C relief, the requirements are that he must have been a permanent resident for seven consecutive years before the application, which there's no contest. You're right about Section 212C. Let me just point this out. Maybe we can, people, understand. Section 212C was repealed April 1, 1997, but it's still available to an alien who pled guilty to a crime before April 1, 1997. Right? That's correct. Okay. And would have been eligible for relief at that time. Then in this circuit, 212C is only available to removable aliens, and he falls into that category, if the ground for removal, rather than the underlying offense, has a statutory counterpart of inadmissibility. You know about that? Yes, of course, Your Honor. I mean, this is kind of crazy, but that's the way it is. Aguilar's first ground for removal was conviction of a crime of violence, an aggravated felony. Well, does that have a statutory counterpart of admissibility? Inadmissibility, yeah. That does not, Your Honor. That does not. All right. That's right. And then 212C relief, now, is that available? Well, on my notes, what I have is that it's not available to waive Aguilar's second ground of removal and his conviction for two crimes involving moral turpitude, because he pled guilty to the second crime of moral turpitude after Section 212C was repealed. See? He pled guilty after April 1, 1997. So he doesn't have that statutory counterpart. But he does, Your Honor, because in 212A, which provides the statutory counterparts, the one crime of moral turpitude provides a ground for excludability or exclusion or inadmissibility. We've changed the terms over the years. But inadmissibility under 212A, it's a single crime of moral turpitude. So at that time, when Mr. Aguilar pled guilty in 1990, there was he was pleading guilty to a crime of moral turpitude. So, therefore, 212C relief would have been available. That's kind of convoluted. I'm not sure I can follow it, but I'll try. So at the time that Mr. Aguilar pled guilty in 1990. Yeah. Pled guilty to what? To a robbery. Yeah. Okay. That was considered a crime of moral turpitude. So as a crime of moral turpitude, he wants a counterpart. That's what I'm trying to figure out. Well, there is under 212A, and I believe it's 212A, 2, little I, big Roman numeral I, a crime of moral turpitude is a ground for inadmissibility. That's a statutory counterpart. Moral turpitude is a ground for inadmissibility. Moral turpitude, he cannot be sent out of the country? The inadmissibility has to do, actually, with an alien, illegal resident leaving the country and then attempting to return. Right. He can't get in. Under 212A, he would be subject to inadmissibility, yes. Right. Yeah, but that's somebody trying to get in. This, what do you call him, Ramos or Aguilar? Mr. Aguilar, yeah. Well, what's with Ramos? I can't figure out why you're saying Aguilar if it's Ramos. When I talk to my client, it's Aguilar. Yeah. Well, he's not in that category. He can't claim the benefits of that because he's not outside. He's inside of this country. But the, it doesn't apply to him at all. No, the applicable regulation, and I think what the Court's getting at is there was a case, it came down in January of this year, which was McKasey versus Abebe, which made that distinction. But in that case, the Court also said that it left it to the INS to make the regulations. Now, on the books, we have CFR 1212.3, which applies not only to aliens who are admissible, but also deportable. That's the language of the statute. And under 1212.3, if there is a statutory counterpart, an alien is entitled to 212C relief. Well, I'll try to follow it in your brief. I'd salute and read the statute. But I think you ought to spend some time on Katz. Okay. Of course, Your Honor. I mean, it's up to you. You're arguing. No, no, no. I appreciate the suggestion. And, of course, one of the other areas that we believe the immigration judge ruled incorrectly was his failure to properly weigh the evidence regarding Katz that Mr. Aguilar submitted to the immigration judge. And under the current statutory scheme, if Mr. Aguilar prevails in this point, he's entitled to deferral of removal, meaning he won't be released. It's delayed. So, obviously, if the Court were to remand this case back down to the BIA, Mr. Aguilar would be able to. This is a grounds that he can stay in the country. So again? It grounds that Mr. Aguilar could stay in the country. So that's why this is. So you would say that we've got to remand on that issue? Yes. Okay. Well, I mean, of course, I would, if the Court does have the option of finding that he is subject to, or he did submit sufficient evidence for the Katz question, but at the very least, I would ask for remand. And at the level of the immigration court, Mr. Aguilar actually submitted three sets of evidence. One was Mr. Aguilar's own testimony that he would more likely than not face torture. The second was there was a country report issued by the State Department regarding the country he will be removed to, which is El Salvador. And the record is devoid of any evidence of the Court even considering that report, which according to the Kamautis case, which was cited in our brief, a country report on its own can be sufficient for finding that evidence. You know what bothers me? This is a prisoner who gets himself all tattooed, and that's the reason he said, you know, if they send me back to El Salvador, they're going to find me tattooed, think I'm a member of a gang, and he's dead. If we decide that, you realize that everybody in jail who is an immigrant and is from one of those countries where tattoos indicate membership in a gang, they're all going to get tattooed. Now, isn't that a concern of ours? Well, but, you know, we've got to look at this individual case, which is beyond. I just say, isn't that a kind of policy concern that we ought to think about? I understand that, Your Honor, but ultimately the convention against torture is supposed to a country sending an individual outside the country. If they're sent into a situation where they are more likely than not to be subject to torture, then that country should not remove the individual. Counsel, Judge Gould with a question for you, if I may. It's really along the same line of Judge Lay's question. Now, I certainly understand the idea that under Camalthus, it was an error if the EIJ did not consider the country report. But what I'm concerned about is what I think Judge Lay may have been adverting to. If every member of the Mara Salvatrucha gang gets tattoos, you know, if that's just part of their deal, and every gang member of Mara Salvatrucha is tattooed, does ruling on that ground for your client here mean that no member of that gang with his or her tattoo, even if an illegal immigrant, can ever be sent back to El Salvador? Well, Your Honor, I mean, I still think we have to look at the actual... I realize we do, but I really would like you to answer my question, because issues like that can affect what we say on a remand. And, you know, I would be being irresponsible, I think, if I didn't consider that question. Is that yes or no, really, the implication of your cat theory? Yes, the implication is that so long as the individual as currently constituted, which would include tattoos, would be subject to torture in El Salvador, which is the current... as of right now, the policy seems to be that the treatment of suspected gang members is to immediately imprison them and or, I mean, in some cases, kill them. Yeah, the implication would be in that situation, if that individual will be subject to torture, then we should not remove them from this country. And so then that means that if, just for example, and I'm not saying your client is in this category, he's said he's not, but if you had people who were definitely, you know, of this gang, that they could never be deported and the US would have to keep them in prison for, you know, indefinitely or for as long as they could. So as long as they did a crime, they'd have to just be put in prison as a consequence of that crime and housed in prison in the US. If they got out, they could do another crime, get back in prison, but the government could never send them back to El Salvador. But we're not asking for a cancellation of Mr. Aguilar's removal or cancellation, you know, in that situation. It's merely deferral of removal. So if and when in El Salvador there's some sign of that they're not going to torture or subject an individual to torture, then the removal is back in the facts. It's just a matter of… Yeah, but basically unless or until the country report from El Salvador said the government's changed and they're now going to welcome tattooed people, none of those people could ever be removed. Your Honor, it's not just tattooed. It's the specific tattoos that Mr. Aguilar has, which has been testified to. But none of the people with the MS tattoo could ever be removed. Mr. Aguilar does not have an MS tattoo. It's that he has an El Salvador tattoo, which the El Salvadorian government interprets as a gang tattoo. Okay, so no person with an El Salvador tattoo could ever be removed? Their removal would be deferred until it no longer is. Until the government changed. I get it. Okay. Okay, thanks. Are you saying he has a unique type of El Salvador tattoo? I believe the tattoo in question is the words El Salvador written on Mr. Aguilar's back. And it's that, for whatever reason, the government in El Salvador sees that as a sign of gang affiliation. And I will note that nothing in the underlying record shows that Mr. Aguilar, I mean, not only did he deny it, but he was not convicted of any crimes involving any allegations of gang affiliation. Well, he's been here since he was seven years old. That's correct. And he's, what is it, 35? Actually almost 40, Your Honor. 40 now. He's 40 years old. And so he's, what is there in the record to substantiate that he'd be harassed, persecuted and killed by the police or other gang members if he were deported? And all this would come about because of this El Salvador tattoo on his back and his status as a criminal deportee. Well, Your Honor, we have Mr. Aguilar's testimony in front of the immigration judge, coupled with expert testimony that was offered at that time, which the immigration judge in- That was from Gonzales? Yeah, Mr. Gonzales. From UCOA? That's correct, Your Honor. And at- And the country report. Right. State Department report. And the State Department report, well, that tells us there was widespread impunity, corruption among the security forces and other governmental authorities, and gang violence. But does it go any further than that? I mean, I think we need to take all this totality of all the evidence presented, which is not just- We have the State Department report, which obviously does not find anything specifically as to Mr. Aguilar. But then we have Mr. Aguilar's own testimony, which the judge disregarded. And then we have the expert testimony, which the judge more or less disregarded because the judge claimed that there were no- The expert did not submit reports, or Mr. Aguilar's counsel never submitted the necessary reports to support that testimony. But there was never actually a credibility finding regarding the expert witness. So the judge never said that, well, Mr. Gonzales is not qualified. The judge just wanted more information. And that evidence was not submitted. And that, of course, goes to our ineffective assistance of counsel claim. If a person qualifies for CAT, is he left free or is he kept incarcerated or anything like that? What happens if CAT applies there? Do you know? I do not. But, Your Honor, I would gladly submit a letter of brief on that point. Well, I just wondered about it. Maybe your opponent here can tell us. I don't know. Okay. All right. All right. Do you owe us six minutes, 13 seconds? I'll pay you on the next argument. All right. Thank you, Your Honor. All right. Good morning, Your Honors. My name is Bo Stanton. I'm here today on behalf of the Attorney General. There was really only one issue before this Court, and that is whether or not the petitioner is eligible for CAT protection. However, I will go ahead and deal with the 212C issue in order to clarify for the Court. 212C is not available for the petitioner in this case. Recently, as Hoosing Council brought up, this Court handed down the presidential decision called Abebe, where this Court rejected that petitioners who were found or charged with mobility have the ability to be eligible for 212C waiver. We said, because that's inadmissibility, you're removable, you're two different classes of people, and they upheld that, and so, therefore, in this case, he's not eligible for 212C waiver. However, if you choose to ignore that case, and you still want to look at the fact whether or not he might be eligible for 212C waiver, he still is not, because there isn't a comparable inadmissibility ground under 212C. Because in this particular case, he was charged on his 1990 conviction, he was charged as an aggravated felon. That is the reason why he's removable, not because of a crime involving moral turpitude. He is trying to sweep that underneath the aggravated felon, but that is not what he was charged with being removable. You look at the charge. Therefore, look at the counterpart statute. There isn't one for an aggravated felon, so he doesn't qualify. However, even if you were to find that there was a counterpart underneath their statute, he's still ineligible, because it doesn't remove the second charge of removability, and that is he is removable as a person who committed two crimes involving moral turpitude. He can't get around that. So at the end of the day, he's still removable. So the only thing he has left to do is show that he's eligible for relief removal. What about the April 1 date? Excuse me, Your Honor? The April 1 date. In regard to the 212C waiver? Yeah. It's irrelevant, because he was charged in 2003 for two crimes involving moral turpitude. What was that in 2003, again? Would you tell me what those crimes were? Yes, he was charged, he was convicted in 2003 of petty theft of priors, and the priors in this particular case was the 1990 second-degree robbery with a deadly weapon, and that's what served as the basis for charge of removability. So the petty theft is a crime of moral turpitude? That's what the board of intervention judge found in this case, and that is not disputed by the petitioner, Your Honor. And what's the other one? The second charge of removability? Yes. That or the second crime? The second crime. The second crime was the 1990 second-degree robbery with a deadly weapon. And even if you were to- Those two are two crimes of moral turpitude. Yes, Your Honor. So it doesn't come under 212C at all? No. Okay, and that's your position? Yes. That's all I'm trying to understand. Right, right. I'm just trying to clarify for you. All right. So now your position is they're off the waterfront on that issue of removability, and so you're saying the only issue that we really need to address is Katz? Yes. Okay. Now turning to Katz, again, just to go ahead and refresh the Court's mind about the standard of review. In this particular case, the only way that you can reject the board of integration judge's decision is that the evidence in the record is so compelling that no reasonable adjudicator could have failed to find him eligible for cap protection. Petitioner has not done so in this case. If you look at the record, if you look with the immigration judge and the board of immigration appeals, why they rejected his eligibility for cap protection, it was first, his testimony alone was insufficient to provide the likelihood that he's going to be tortured upon his return to El Salvador, and it also failed to show that the government of El Salvador is going to consent or acquiesce to the torture of the petitioner in this case. Well, what about Gonzalo's testimony? Gonzalo's testimony is also equally deficient. Why is it deficient? If you look at the testimony, and I can refer you to where in the record. Just tell me. Sure. He says, first off, that the government of El Salvador doesn't consent or acquiesce to the torture of these gang members. That's what Gonzalo says. He says that forthrightly, and that is part of the statutory framework that has to be met by the petitioner in order to be eligible. And at the point that his export witness is saying that no, the government of El Salvador doesn't acquiesce or consent to this, that kills his claim right there. He says that, further, he doesn't do this based on his own personal observations or talking with the petitioner in this particular case, but based on his own case studies. Third, Mr. — There's nothing wrong with that, is there? Excuse me, Your Honor? What's wrong with that? In this particular case, the petitioner's claim is that it's surrounding particular tattoos. He's trying to — An expert witness can base his opinion on publications and on study. He doesn't have to go out and do an investigation in the other country or talk to people from El Salvador who are here. He doesn't have to do that, does he? I guess not, Your Honor. And the government agreed he was a qualified expert. Isn't that right? Yes, Your Honor. Okay. So what's the problem? We can go ahead and kick that out then. But at the end of the day, the expert testimony doesn't establish a greater than 50 percent chance that he's going to be tortured, nor does the expert testimony establish that the government of El Salvador is going to consent or acquiesce to the torture of the petitioner in this case based on his tattoos. Was he asked that 50 percent question? He was not asked that particular question. But, however, he did admit that the — you want to say I didn't refer to my notes? That he did admit that there is no evidence from his own case studies that the government of El Salvador consents to this. Right? But going back to the likelihood of torture in this case — The government of El Salvador is what? Excuse me? Did you say — you used a word and I didn't hear it. Oh, acquiesce, perhaps? Maybe it was acquiesce, yeah. I think you said consents. Yeah. Consents. You said consents. Yeah, you're right. Consent is what I meant. Consents. All right. We'll put a mark down on that. And, you know, the judge was just way off base when he — when he — he demanded that the documents be there. You know, not required to bring the documents. Oh, you're correct, Your Honor, but he did so. Yeah, and the government said — agreed he was an expert. You're correct, Your Honor, but it goes to the weight of the evidence. It goes towards whether or not — Well, it goes to whether you've got a fair hearing or not, too, doesn't it? Whether or not the — If you've got a trier of the fact there who's listening to this and says, well, you know, you haven't made any personal observations or investigation, you didn't even bring all these documents that you claimed you read. Where are they? Even assuming that the immigration judge may have made a mistake in terms of asking — I mean, why should he make a mistake? He does this work day in and day out. He's human. He's attended seminars at the Department of Justice. He's supposed to know these things. Perhaps, Your Honor. I'm not sure what the training of the immigration judge — Well, they have a lot of training. Sure. I'm not going to dispute that. But what I'm saying is even assuming that he did make this mistake, this error, that is not the sole basis under which he denied it. In addition to that, it went to the Board of Immigration Appeals, and they upheld it, not based on that reasoning, but upheld it because he didn't establish a likelihood of torture, nor did he establish that the government of El Salvador is going to consent or acquiesce to his torture. That is the Board of Immigration Appeals upheld and affirmed in their decision, and that's what you look to when reviewing it, not the immigration judge, and whether or not he failed to substantiate his claims. So any error, I would say, was corrected on appeal by the Board. Now, did the immigration judge consider the country report, and did the VIA consider it independently if the IJ didn't? When reviewing both decisions, neither the IJ nor the VIA referred to the country report issued in its decision. So we don't know whether or not they actually did consider it. We can assume they did. We can assume they didn't. But going ahead and raising the issue. Why would we assume they did if they didn't mention it? And that's what I'm saying. You can or you cannot. Well, it's an important thing, isn't it? The country report? Yeah. I mean, it's part of the evidence. Yes, I mean, you can't tell one way or the other. However, though, I want to go ahead and mention, though, that this error, this alleged error by the immigration judge for failing to consider the country report, the Board of Immigration Appeals failed to consider it. The petitioner never raised to the Board on appeal that the immigration judge failed to consider the country report. If this was, in fact, an issue for the petitioner, he should have raised that to the Board of Immigration Appeals. But he did not. Because he did not, he has failed to exalt that issue. Who was his lawyer at that time? For the petitioner? Yeah. I'm not familiar, Your Honor. You don't know who he was? I don't know. You don't know whether he had problems or not? On the appeal to the Board of Immigration, what was the issue? What was raised? What issues were raised to the Board? One was the 212C waiver issue. The other was whether or not he was eligible for cancellation or removal, whether or not he was eligible for KAT. Excuse me? Whether or not he was eligible for CAT. Yes, yes, Captain, yes. If you say that, doesn't that immediately bring up the whole record? That's what CAT is all about. So it seems to me that if the record is there and if they don't mention it, it's probably more likely that they ignored it than that they considered it. Maybe I'm wrong. Well, we don't really know because the Board's opinion is silent. The other thing I was going to ask you is the same question. I suppose what happens to somebody who is allowed to stay in this country on CAT? Is that person incarcerated or let to go free, or what happens? You know. Yes, I do, Your Honor. Okay. In this particular case, the petitioner is detained, and if he is, I don't know whether or not in this particular case he's detained just because of his immigration violations or whether or not he's detained because of his prison, whether or not he's fully served. But he is detained. But he is detained. And, in fact, if we went ahead and allowed him to prevail on CAT or a Sunderbank, whatever telefinal decision, he's being detained by, I take it by the immigration authorities, probably some jail or prison? Yes. And so if you were to find him eligible for CAT relief, then he would be freed. He would be what? He would be freed. Well, that's what I wanted to know. He would be freed. Yes. But if we sent it back for a fair hearing on CAT, he wouldn't be released. No, Your Honor. No. He wouldn't be released. No. That's what bothers me about CAT relief. If he got CAT relief, at that point he'd be freed unless he was subject to prosecution by some government entity, state or federal, for some other crime, right? Yes. I mean, that's where I was trying to go earlier, is that if he is already convicted of a crime, for example, the petty theft of priors, if he still has months or time to serve on that, then he'd be incarcerated even if he were granted CAT protection. Oh, yeah. Yeah. Well, let me get this straight then. But before the hearing, he was not detained until the immigration judge determined that he was not eligible to remain in this country. Isn't that true? I'm not entirely sure, Your Honor. I think he may have been detained prior. I think depending on what you're charged with, it's up to the discretion of the immigration officer to determine whether or not you're going to be detained. See, the problem that I'm concerned about is if we should, for example, I'm not saying we would, but suppose we said, for example, that the immigration judge and the board didn't really consider the report of the country, it didn't really give ample consideration to the expert testimony. You know, by the time this went back, how many years would expire? It would be a concern of mine that he'd be incarcerated all this time for not having committed any additional crime. That's correct, Your Honor. Pardon? That's correct. I mean, that is what would happen. He should be released pending this hearing. Can you repeat the question, Your Honor? Do we have the power to say if we should remand that this individual should be released on some sort of bond pending further hearings? I am not sure. Okay. I could try to find out. Why don't you just find out? I would maintain, though, that remanding this case is unnecessary. Well, I know. But that's a possibility we have to decide. And you may be right. We don't have to worry if you're right. But if you're wrong, then we have to worry. Correct, Your Honor. Yeah. And so how did he come to the attention of the authorities? It was his 2003 conviction for petty theft of priors. Uh-huh. And so when did the removal proceedings start? In 2003 with the commencement of the filing of the notice of appeal with the Immigration Court. When was this? 2003. Same year, 2003? Let me just double-check before I ---- 2005, excuse me, Your Honor. It was 2005 that it was the notice of appeal was filed.  Yes, Your Honor. How much time does he got? He's in custody on other matters, right? I believe he's just in custody based on the charge of removability. What, you don't know? Excuse me, Your Honor? You don't know? I hate to admit my ignorance, but I do not know. You hate to admit your what? My ignorance. There's nothing wrong with that. A little ignorance is a good thing sometimes. But, well, we can find out easily whether he's still in custody. Oh, I know he's still in custody now. I do know he's in custody now. Well, I mean, that doesn't mean ---- See, what bothers me here is the way this matter was handled before the immigration judge, you know, with the way he dealt with Gonzales and the way he just didn't even address the country reports and some other matters there that I didn't really feel that they got a fair hearing on that. I mean, I've never run across a situation where you get someone, the government says this person qualifies as an expert, and then you start railing on him that you didn't go there, you didn't talk to people, you didn't do any research, and where are all these documents? You could have asked for them, and they probably could have been produced that same day.  You know, that's not a way to run a hearing, I don't think, anyway. Well, if you go back and read the transcript, actually, before the immigration judge, the immigration judge does verbalize that he is concerned that these documents not have been produced. He did that in regard to Petitioner's testimony. He did that in regard to Gonzales' testimony, and it was still not produced. So the immigration judge did present that issue to Petitioner, and Petitioner still did nothing about it. So if you're worried about the fair process or whether or not you received a fair hearing, the immigration judge did verbalize that. You just have to go back and read the transcript. Well, did he say bring those documents in? Did he tell them to bring them in? I have to go back and read. I don't remember specifically what he said, but I do know he brought it to the attention on multiple occasions. This just wasn't one instance where the immigration judge said, you know, you need to substantiate your claims of documents only one time. He did this on numerous occasions, and that's outlined in the Respondent's Brief. But if you go back and read the transcript, it corroborates it. Yeah, but if a man qualifies as or a woman qualifies as an expert, they're not really expected to bring in the library on which they base certain opinions. Well, Your Honor, in this case, I would say the immigration judge even ignored it. I mean, he took that into consideration, but he also found the alternative, which this is what the Board of Immigration Appeals upheld on appeal, was that the testimony alone didn't establish a likelihood of torture or that the government of El Salvador is going to torture or consent or acquiesce to the torture. So even ignoring the fact that he had questions regarding the – But we don't know whether the BIA even looked at the country report. You're correct, Your Honor. It's not – we can't tell them anything. That's a pretty important document. But if you go back and look at the document, it doesn't bolster the petitioner's claim. It doesn't do anything for the petitioner's claim. If you go back and read it, it doesn't establish that the El Salvadorian government is going to consent or acquiesce to the torture of the petitioner when he returns. There is no evidence that they have done it in the past to other people who have returned. He simply cites there's simply no evidence, and there's no compelling evidence in this particular case that would make this panel or any reasonable adjudicator reject a decision below. And so even with all your possible concerns regarding the fact that they didn't consider the country report or maybe, you know, they questioned the expert testimony, that evidence still standing by itself is insufficient to meet the high standard in this case. Receiving eligible relief. Let me ask you, what debating team were you on? University of Florida. Is that right? Yes. Okay. Do okay. Do okay? You bet. Is it that obvious? Yes. What did you say? Was it that obvious? What? That I was on the debate team. Well, actually, I didn't know you were on a debate team. I just thought you were a skilled advocate, so you're doing a good job. Yeah, you're doing a good job. Both of you. I like to hear good lawyers. Yeah. We've heard some good lawyers today, and both of you deserve a pat on the back, even if we let you go beyond the red light. Thank you. Well, let's see. Next time the government argues, we'll deduct six minutes. And how much are we going to deduct from you? About six minutes. Okay, six minutes. Well, we'll call it a draw then. Forget about it. All right. Okay. Thanks very much. Thank you very much. The matter will stand submitted. Now we come to the last matter on our calendar. And let's see. Turn this next page. Raymond Honho versus Dow Chemical. Let's then continue. That will retain that case. Now we come to American Trucking Association versus the City of Los Angeles.
judges: Bright, Pregerson, Gould